1  JASON M. FRANK (190957)
   ANDREW D. STOLPER (205462)
2  SCOTT H. SIMS (234148)
   FRANK SIMS & STOLPER LLP
3  19800 MacArthur Blvd., Suite 855
   Irvine, CA 92612
4  Telephone:   (949) 201-2400
   Facsimile:    (949) 201-2405
5
   FRANKLIN D. AZAR (*pro hac vice*)
6  FRANKLIN D. AZAR & ASSOCIATES, P.C.   CHARLES E. SHAFFER (*pro hoc vice*)
   14426 East Evans Avenue                LEVIN SEDRAN & BERMAN
7  Aurora, CO 80014                       510 Walnut Street, Suite 500
   Telephone:   (303) 757-3300            Philadelphia, PA 19106
8  Facsimile:    (303) 759-5203           Telephone:  (215) 592-1500
                                          Facsimile:    (215) 592-4663
9

10 *Attorneys for Plaintiffs, the Proposed Class and Subclasses*

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13

14 ARMANDO HERRERA, EDUARDO          Case No.:  8:18-cv-00332-JVS-MRW
   SALCEDO, DENA LUCERO,
15 FREDERICK BROWN, VANITY           **PLAINTIFFS' MEMORANDUM**
   ARRINGTON, KASHIF Z. AWAN,        **OF POINTS AND AUTHORITIES**
16 GRETTA CARTER, JAMES ATKINS,      **IN SUPPORT OF *EX PARTE***
   ILKA ROBINSON-EATON, JANET        **APPLICATION FOR AN ORDER**
17 CORPES, TERRI JONES, HEIDI        **RESTRAINING DEFENDANTS**
   HUMPHREYS, RIA MARTEINS, BRIAN    **FROM CONTACTING PUTATIVE**
18 T. SWEENEY, NAKECIA M.  DEAN, and **CLASS MEMBERS WITHOUT**
   VON GRIFFIN each individually and on **PRIOR WRITTEN CONSENT**
19 behalf of all others similarly situated, **AND OTHER RELIEF TO**
                                          **REMEDY DEFENDANTS'**
20              Plaintiffs,               **OBSTRUCTION OF THE**
                                          **COURT'S "OPT-IN" CONTACT**
21 vs.                                    **PROCEDURE**

22 WELLS FARGO BANK, N.A. D/B/A       **[Notice of Application, Declarations**
   WELLS FARGO DEALER SERVICES,      **of Andrew Stolper, Eric Kibler,**
23 INC., a national association, and WELLS **Leslie Lazerevic, Roxanne Dorn,**
   FARGO & COMPANY, a corporation    **Jennifer Acton and Elizabeth**
24                                    **Barrera, and *[Proposed]* Order filed**
              Defendants.             **concurrently herewith.[**
25

26

27

28

# **TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................. 4

II.  FACTUAL BACKGROUND.............................................................. 8

     A.   Brief Description of the Case. ...................................................... 8

     B.   The Court Adopts an "Opt-In" Belaire-West Procedure Requiring
          Customers to Expressly Consent to Having Their Contact Information
          Provided to Plaintiffs' Counsel. ................................................. 9

     C.   Wells Fargo's Lawyers Immediately Begin Calling Customers Who
          Consented to Being Contacted by Plaintiffs' Counsel............................ 11

     D.   Wells Fargo is Engaging in Deceptive Conduct and Frustrating the Purpose
          of the Court's "Opt-In" Notice Process...................................... 12

III. LEGAL STANDARD ...................................................................... 13

IV.  THIS APPLICATION SHOULD BE GRANTED.............................................. 14

V.   PLAINTIFFS' REQUESTED RELIEF SHOULD BE GRANTED ON AN
     EXPEDITED BASIS. ...................................................................... 16

VI.  CONCLUSION.............................................................................. 18

MEMORANDUM ISO APPLICATION FOR RESTRAINING ORDER AND OTHER RELIEF

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

Gulf Oil Co. v. Bernard,
    452 U.S. 89 (1981).............................................................................13

Mevorah v. Wells Fargo Home Mortg., Inc.,
    2005 WL 4813532 (N.D. Cal. Nov. 17, 2005) ........................................... *passim*

O'Connor v. Uber Techs., Inc.,
    2013 WL 6407583 (N.D. Cal. 2013) .............................................................13, 14

**California Cases**

Belaire-West Landscape, Inc. v. Sup. Ct.,
    149 Cal.App.4th 554 (2007) ............................................................ *passim*

**Other Authorities**

Federal Rules of Civil Procedure Rule 23(d)...........................................................13

## I.    INTRODUCTION

On August 21, 2019, this Court (Judge Michael R. Wilner presiding) ordered a modified <u>Belaire-West</u> "opt-in" procedure, whereby postcard notices would be sent to 6,000 putative class members to seek their affirmative permission to be contacted by Plaintiffs' counsel.  (Doc. 60.)  The putative class members are former Wells Fargo customers who paid off their auto loans years ago.  The postcards stated that "the lawyers representing the proposed class suing Wells Fargo have requested permission to contact you concerning your loan, your payoff, and your GAP refund if any.  You have no obligation to agree to be contacted – whether you wish to be is entirely your decision." (Declaration of Andrew Stolper ("Stolper"), Ex. A.)  If the putative class member wished to be contacted, then they were required to send in a signed consent form in which they affirmed their "consent to being contacted by ***the lawyers representing the class*** concerning your loan."  (<u>Id.</u> (emphasis added).)

On March 12, 2020, the court-approved third-party administrator mailed the 6,000 notices.  (Stolper, ¶ 3.)  Since that time, the administrator has been providing weekly updates of the putative class members who have sent in Consent Forms agreeing to be contacted by the "lawyers representing the class." (<u>Id.</u>)  Their contact information is then provided to Plaintiffs' counsel.[1]  (<u>Id.</u>) What was supposed to happen next was Plaintiffs' counsel would contact these individuals and seek their permission to obtain their loan files from Wells Fargo.  (<u>Id.</u>)

And so shortly after these putative class members consented to being contacted by "the lawyers representing the class," they received a telephone call from a lawyer – just like they expected and consented.  (Declarations of Roxanne Dorn ("Dorn"), Leslie Lazerevic ("Lazerevic"), Jennifer Acton ("Acton") and Elizabeth Barrera ("Barrera") (collectively, the "Putative Class Member Decls.").)  The lawyer explained how the putative class member "received a postcard in the mail asking if you wanted to be

---

[1] Because the putative class members are former Wells Fargo auto loan customers, Wells Fargo already possessed their contact information and provided it to the third-party administrator in order for the postcard notices to be mailed.

MEMORANDUM ISO APPLICATION FOR RESTRAINING ORDER AND OTHER RELIEF

contacted by counsel" and "based on our records, we understand that you agreed to be contacted." (Id.)  The lawyer then asked questions about the putative class member's claims and instructed them to call the auto dealership where they purchased their car to receive their GAP refund.  (Id.)

Except this call was not from Plaintiffs' counsel.  It was from the lawyers representing Wells Fargo.  (Dorn, ¶ 4).

Wells Fargo has been engaging in highly improper and misleading conduct, which is intentionally designed to obstruct the Belaire-West "opt-in" process adopted by the Court.  These putative class members did not consent to be contacted by Wells Fargo. They only consented to be contacted by the "lawyers representing the class." (Stolper, Ex. A.)  As a result, these putative class members are often confused into believing they are speaking with Plaintiffs' counsel -- when, in fact, they are speaking with the lawyers for the defense -- because these individuals are expecting and only consented to a call from the "lawyers representing the proposed class suing Wells Fargo." (Declaration of Eric Kibler ("Kibler"), ¶ 7; Putative Class Member Decls.)  In support of this Application, Plaintiffs are submitting declarations from a number of putative class members who were, in fact, confused by these calls.  (Putative Class Member Decls.)

Even when these lawyers disclose they are "from Wells Fargo," they are deceptively telling the putative class members they consented to be "contacted by counsel" and then reference the Court-approved postcard as a ruse to keep them on the phone and/or return their calls.  (Putative Class Member Decls.)  But these individuals did not consent to be contacted by Wells Fargo's counsel; they consented to be contacted by the "lawyers representing the class." (Stolper, Ex. A.)  The postcards received by the putative class members had nothing to do with them consenting to speak with Wells Fargo's lawyers – the postcards requested permission for Plaintiffs' counsel to contact them.  Yet Wells Fargo invariably references these postcards, and the consent to be contacted by "counsel," because it knows these putative class members are far more likely to call back or engage in a conversation if it *sounds like* something they agreed to.  In

other words, Wells Fargo is deceptively using the prestige of a Court-approved process to trick customers into responding to, what are in reality, unsolicited "cold calls" from Wells Fargo's attorneys.

Over the past few weeks, Plaintiffs have discovered Wells Fargo has deployed an army of associates from offices across the country to race to get ahold of these customers *before* Plaintiffs' counsel can reach them. (Kibler, ¶ 6.)  As soon as the third-party administrator provides the names of the putative class members who elected to be contacted by "the lawyers representing the class," Wells Fargo's attorneys immediately bombard these individuals with multiple telephone calls and voicemails they did not consent to, including over weekends. (Id. ¶¶ 7-8.)  In addition to the deceptive tactics described above, by immediately inundating these putative class members with multiple telephone calls and voice mails, Wells Fargo makes it far less likely they will return *any calls* associated with this case – including calls from Plaintiffs' counsel.  In fact, as soon as Wells Fargo started calling the opt-ins, Plaintiffs' counsel noticed an appreciable dip in the number of opt-ins returning their calls – calls which were expressly invited by these putative class members as part of a Court-approved process. (Kibler, ¶ 9.)  As such, Wells Fargo is deliberately frustrating the purpose of the Court's Belaire-West "opt-in" procedure – which was designed to give customer's the affirmative choice to be contacted by *Plaintiffs'* counsel and to obtain a "statistically relevant" number of unredacted loan files.

It should not be lost on this Court that out of approximately 1.7 million putative class members, Wells Fargo only appears to be contacting those who affirmatively indicated they wish to speak with Plaintiffs' counsel about their potential claims.  This would not be possible with a typical Belaire-West procedure, where notice is provided to all putative class members and their contact information is released to plaintiffs' counsel en masse unless they affirmatively "opt-out."  (Belaire-West Landscape, Inc. v. Sup. Ct., 149 Cal.App.4th 554, 556 (2007).)  This Court, at the urging of Wells Fargo, was concerned about the privacy of putative class members and did not want them receiving

unsolicited telephone calls from lawyers without expressly consenting to such contacts; thus, the Court required Wells Fargo's former customers to "opt-in" to being contacted by the "lawyers for the class." (Doc. 60; Stolper, Ex. A)  But, this "opt-in" procedure has the unintended consequence of informing Wells Fargo of the identities of putative class members who wish to speak with Plaintiffs' counsel about their claims – information Wells Fargo would not otherwise learn.  The fact Wells Fargo is twisting a process designed to protect people's privacy into a vehicle to target those individuals expressing an interest in potential claims against Wells Fargo is unseemly, especially when Wells Fargo is deceptively using the imprimatur of a Court-approved process to deceive its former customers into speaking with its lawyers without the protection of their own attorney.

Plaintiffs are seeking the relief described below on an expedited basis to immediately stop Wells Fargo from further engaging in this deceptive conduct.  Plaintiffs requested Wells Fargo immediately cease this practice last week and, rather than doing so, Wells Fargo redoubled their efforts. (Stolper, Exs. B and C; Kibler, ¶ 8.)  Accordingly, Plaintiffs request this Court issue an order granting the following relief which is modeled after an order issued against Wells Fargo in a previous class action (Mevorah v. Wells Fargo Home Mortg., Inc., 2005 WL 4813532, at *5 (N.D. Cal. Nov. 17, 2005)):

1.     Neither party (including the party's counsel or their agents) may directly contact any non-represented putative class member unless that putative class member has consented to be directly contacted by that party in advance in writing.  Contacts undertaken in the regular course of business will be excepted from this restriction.

2.     From the list of customers who expressly consented to be contacted by the "lawyers representing the proposed class suing Wells Fargo" as part of the Court-approved "opt-in" procedure, Wells Fargo should be required to:

a.     Disclose which of these putative class members Wells Fargo attempted to contact and the name, title and employer of the individual(s) who attempted to contact the putative class member on behalf of Wells Fargo;

b.      Disclose which of these putative class members Wells Fargo successfully contacted, when the successful contact(s) was or were made, and by whom the successful contact(s) was or were made (including their name, title and employer);

c.      Produce copies of the scripts, talking points, etc. that were used with these putative class members; and

d.      Produce copies of all declarations, statements or other written communications exchanged with these putative class members, regardless of whether the declarations were ultimately signed.

3.     The "opt-in" contact process approved by the Court and negotiated by the Parties should be re-conducted with a new pool of 6,000 former customers under the same terms and conditions, except that Wells Fargo will not be notified of the identity of the customers who requested to be contacted by Plaintiffs' counsel.

## II.   FACTUAL BACKGROUND

### A.    Brief Description of the Case.

This proposed nationwide class action concerns Wells Fargo's practice of knowingly collecting unearned fees for Guaranteed Automobile Protection Waivers ("GAP Waivers").  (Doc. 102, ¶ 1.)  Wells Fargo collects the unearned fees from customers when they pay off their auto loans before the end of the original loan term. (Id.)  Wells Fargo knows these fees are not and will never be earned but collects them anyway.  (Id.)  Wells Fargo then refuses to refund this unearned money, even though Wells Fargo is contractually obligated to do so as the creditor and assignee of the auto loan and GAP Waiver.  (Id.)  As a result of this practice, Wells Fargo knowingly collects and keeps approximately $100 million *per year* in unearned fees from its customers.  (Id.) It has been engaging in this practice for more than a decade.  (Id.)

In their operative First Amended Complaint ("FAC"), Plaintiffs allege that Wells Fargo falsely informs customers who pay off their auto loans early that they need to contact the original auto dealership that sold them their vehicle to determine if they "may be" eligible for a "possible refund" of the fees paid for GAP coverage.  (Doc. 102, ¶ 13.)

Plaintiffs allege these statements are misleading for two reasons. (Id.) *First*, Wells Fargo knows GAP Waivers provide for a refund when customers pay off their auto loans early, and Wells Fargo can calculate the amount of the refund owed to each of its customers from its own records. (Id.) So, using the words "may" and "possible refund" is deceptive and false. (Id.) *Second*, Wells Fargo is the party that owes the contractual obligation to the customers to issue the refund. (Id., ¶ 14.) Consequently, misdirecting customers to contact the dealer -- with whom the customer may not have had any interaction since the vehicle was purchased -- is simply a way to deter customers from obtaining their money back from Wells Fargo. (Id., ¶ 13.) In fact, Wells Fargo's management admitted in deposition testimony that Wells Fargo knows most customers will not go back to the auto dealership where they originally purchased their vehicle to find out if they "may" be entitled to a refund of some undisclosed amount. (Id., ¶ 12.)

Based on these allegations, Plaintiffs are seeking to represent a nationwide class and various state subclasses to obtain a refund of the unearned GAP fees collected by Wells Fargo, with interest, as well an injunction requiring Wells Fargo to either refrain from collecting these unearned fees or immediately refund them in the future. (Doc. 102, ¶ 17.)

**B.    The Court Adopts an "Opt-In" Belaire-West Procedure Requiring Customers to Expressly Consent to Having Their Contact Information Provided to Plaintiffs' Counsel.**

Wells Fargo originally agreed to produce the loan files for a sample of 601 randomly selected putative class members. (Stolper, ¶ 2.) Plaintiffs intended to use this information to, among things, confirm these former Wells Fargo customers did not receive their GAP refunds and demonstrate this sample was representative of the entire class. (Id.) However, in breach of this agreement, Wells Fargo produced the loan files in redacted form, removing all the names and contact information, thereby rendering the files largely useless. (Id.)

Accordingly, Plaintiff Janet Corpes filed a motion to compel Wells Fargo to

produce the 601 loan files without redactions.  (Doc. 57.)  Wells Fargo opposed the motion, arguing, *inter alia*, that "calling putative class members is a great intrusion into an individual's statutorily protected privacy."  (Id., p. 5.)

In granting Plaintiff's motion, the Court found that Wells Fargo's "production of redacted loan files that failed to adequately identify any customer was, in turn, problematic."  (Id., p. 2.)  However, at the hearing, the Court also expressed the view that it would be jarring and intrusive for former customers to receive a call on their cell phones from lawyers about a lawsuit without first consenting in writing.  (Stolper, ¶ 2.)

In order to safeguard this privacy interest, the Court ordered the parties to engage in a modified <u>Belaire-West</u> "opt-in" procedure, whereby putative class members would need to affirmatively consent to having their contact information provided to Plaintiffs' counsel (rather than opting out).  (Doc. 60, p. 1.)  The Court recognized these notices would need to be sent to a much larger population than the original 601 borrowers in order to obtain a similarly "statistically relevant number of class contacts" who would "opt-in" to be contacted.  (Doc. 60, p. 1.)  After further briefing by the Parties, the Court ultimately approved a third-party administrator sending postcard notices to 6,000 former customers of Wells Fargo throughout the United States.  (Stolper, ¶ 3.)

The parties then spent months negotiating the content of the postcard notice with the assistance of the Court.  (Stolper, ¶ 4.)  The notice agreed to by the parties solely concerned whether the individual would grant permission for Plaintiffs' counsel to contact them as set forth below:

<b><u>NOTICE</u></b>

There is a class action lawsuit in which the plaintiffs claim that Wells Fargo failed to provide individuals, including possibly you, a refund of Guaranteed Auto Protection or "GAP" fees that you were entitled to when you paid off your loan. Wells Fargo denies any wrongdoing because, among other reasons, it claims that to the extent a refund is due and has not been made, Wells Fargo is not the party responsible for making the refund.

The lawyers representing the proposed class suing Wells Fargo have requested permission to contact you concerning your loan, your payoff, and your GAP refund, if any. You have no obligation to agree to be contacted – whether you wish to be is entirely your decision.

(Id., Ex. A.)  The putative class members were then required to sign a Consent Form providing consent to "being contacted by the lawyers representing the class":

**CONSENT FORM**

This postcard is being sent to you because Wells Fargo's records indicate that you previously had a Wells Fargo automobile loan. By signing below, you affirm that (1) you are the person to whom this postcard is addressed, (2) you have read the enclosed Notice, and (3) you consent to being contacted by the lawyers representing the class concerning your loan. You can also file your Consent Form online at www.WellsFargoGapLawsuit.com.

(Id.)  These notices were sent to 6,000 former Wells Fargo customers all of whom paid off their Wells Fargo auto loans at least *three years ago*.  (Id, ¶ 3.)

**C.    Wells Fargo's Lawyers Immediately Begin Calling Customers Who Consented to Being Contacted by Plaintiffs' Counsel.**

The postcard notices were mailed on March 12, 2020.  (Stolper, ¶ 3.)  Each week thereafter, the third-party administrator would notify counsel for the Parties of the names of the customers who had sent in the Consent Forms agreeing to be contacted by "the lawyers representing the class." (Id.)  The administrator would then provide Plaintiffs' counsel with their contact information.  (Id.)

Plaintiffs' counsel then began contacting these putative class members and seeking their written authorization for Wells Fargo to produce their loan files. (Stolper, ¶ 3; Kibler, ¶ 2.)  In the course of making these calls, Plaintiffs' counsel learned that Wells Fargo was also contacting these individuals, even though these putative class members never consented to being contacted by Wells Fargo's attorneys. (Id.)  Plaintiffs' counsel then contacted Wells Fargo's counsel, who confirmed it was engaging in this practice. (Stolper, ¶ 5; Ex. B.)  Having received that confirmation, Plaintiffs' counsel sent a meet and confer letter to Wells Fargo's lawyers on April 23, 2020 requesting that they immediately stop this conduct.  (Id., Ex. B.)  The following afternoon (Friday), the parties received a batch of names of putative class members who consented to be contacted by Plaintiffs' counsel from the administrator.  Rather than stop their deceptive calls, Wells Fargo redoubled its efforts and called these putative class members over the weekend in a (successful) effort to reach them before Plaintiffs' counsel could.  (Kibler, ¶ 8.)  Then, on that Tuesday, Wells Fargo responded to Plaintiffs meet-and-confer letter by asking Plaintiffs for discovery on Wells Fargo's own conduct.  (Stolper Decl. Ex. C.)

### D.     Wells Fargo is Engaging in Deceptive Conduct and Frustrating the Purpose of the Court's "Opt-In" Notice Process.

Provided with this Application are declarations from putative class members who received these calls from Wells Fargo.  As the declarations explain, these individuals were confused about who they were speaking with, because they were expecting a call from Plaintiff's counsel as set forth in the postcard notice, not Wells Fargo's lawyers. (Putative Class Member Decls.)  At times, Wells Fargo's lawyers did not identify they were affiliated with Wells Fargo or delayed in doing so until the end of the call. (Lazarevic, ¶ 4; Barrera ¶ 4.)  Even when they did disclose their identity, Wells Fargo's lawyers would deceptively reference the postcard notice and tell the former customers they "consented to be contacted by counsel" in the post-card they received from the Court – which is highly misleading, because these former customers *never* consented to being contacted by Wells Fargo's attorneys; they only consented to be contacted by the "lawyers representing the class."  (Lazarevic, ¶ 2, Dorn ¶ 7; Acton ¶ 9.)   In their declarations, they explain how they felt deceived by these calls and were uncomfortable speaking to Wells Fargo's lawyers without being represented by their own.  (Acton ¶ 6.)

Further, Wells Fargo is apparently instructing these putative class members to contact the auto dealerships where they bought their cars and ask for a refund of their GAP fees.  (Lazarevic ¶ 4.)  In other words, Wells Fargo is using this process as a means to interfere with the current state of the evidence.  This is clearly not out of sudden concern for its former customers.  After all, Wells Fargo is not calling its other 1.7 million customers who did not receive their GAP refunds.  Wells Fargo is only targeting the former customers who affirmatively indicated they would like to speak to Plaintiffs' counsel about their potential claims in this lawsuit.

Moreover, as the putative class members' declarations explain, Wells Fargo's lawyers are inundating these individuals with multiple telephone calls and voice mails, which they find harassing.  (Acton ¶¶ 3-7; Lazarevic ¶¶ 4-7)  As one declarant testifies, after receiving two calls from Wells Fargo's attorneys, she was not going to answer a

third call from an "unknown number" because she felt "harassed" by the calls. (Lazarevic ¶ 6.) Fortunately, she did so and learned it was from Plaintiffs' counsel. (Id.) However, Plaintiffs' counsel noted an appreciable dip in the number of returned calls after Wells Fargo's lawyers started contacting customers. (Kibler, ¶ 9.) Wells Fargo's conduct is undoubtedly frustrating Plaintiffs ability to obtain a "statistically relevant number of contacts" and customer loan files – which was the original purpose of this Court approved process. (Doc. 60.) In fact, after the last batch of names were released on a Friday afternoon, Plaintiff's counsel tried to reach them the next Monday, only to learn that numerous Wells Fargo's attorneys were contacting these customers over the weekend. (Kibler, ¶ 8.)

## III.   LEGAL STANDARD

"In general, district courts have both a duty and broad authority to control communications to putative class members even before class certification and to enter appropriate orders governing the conduct of counsel and the parties." (O'Connor v. Uber Techs., Inc., 2013 WL 6407583, *4 (N.D. Cal. 2013); see also Gulf Oil Co. v. Bernard, 452 U.S. 89, 99-100 (1981) ("Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties.").) Thus, for example, "[c]ourts have limited pre-certification communications with potential class members after misleading, coercive, or improper communications were made." (Mevorah v. Wells Fargo Home Mortg., Inc., a div. of Wells Fargo Bank, 2005 WL 4813532, at *3 (N.D. Cal. Nov. 17, 2005).) "The foundation for the court's duty and broad authority is found in Rule 23(d) of the Federal Rules of Civil Procedure." (Id.)

"[A]ny limitations on pre-certification communications between parties and potential class members should be "based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." (Mevorah, 2005 WL 4813532, at *3.) The requisite factual finding "does not require a finding of actual misconduct [ ]," but rather, "[t]he key is whether there is

potential interference with the rights of the parties in a class action." (O'Connor, 2013 WL 6407583, at *4–5 (internal quotation marks omitted).)

## IV. THIS APPLICATION SHOULD BE GRANTED.

This Court should grant this Application for at least the following reasons:

*First*, Wells Fargo is abusing the Court-approved Belaire-West "opt-in" process as a means to deceive putative class members into accepting unsolicited "cold-calls" from Wells Fargo's attorneys. This deception is best understood from the perspective of the putative class members. They receive a notice in the mail indicating that "the lawyers representing the proposed class suing Wells Fargo have requested permission to contact you." (Stolper, Ex. A.) They then send in a Consent Form affirming they "consent to being contacted by the lawyers representing the class concerning your loan." (Id.) A week or so later, they receive a telephone call or voicemail referencing how they "received a postcard in the mail asking if you wanted to contacted by counsel" and "based on our records, we understand that you agreed to be contacted." (Dorn ¶ 4.) In these circumstances, it is not surprising putative class members will be confused about who they are speaking with, because they are expecting a call from the "lawyers representing the class." (See generally, Putative Class Member Decls.) Indeed, that appears to be Wells Fargo's design.

Wells Fargo will no doubt claim their lawyers are identifying themselves as being "from Wells Fargo" and thus their contact is not deceptive. However, according to the putative class members actually receiving these calls, this is not always occurring during the call, or is only being revealed toward the end of the call. (Lazarevic ¶ 4.) Moreover, even when it is being revealed, Wells Fargo is falsely giving these individuals the impression they consented to being contacted by Wells Fargo's attorneys by referencing the postcard and stating that their records indicate the customer "consented to being contacted by counsel." ((Dorn ¶ 4; Acton ¶ 4.) But, as noted above, the postcard notice and Consent Form only provide permission to be contacted by the "lawyers representing the class." (Stolper, Ex. A.) These putative class members *never* provided permission to

be contacted by Wells Fargo's attorneys in the postcard, which is the core of Wells Fargo's deception.  (Id.)  As such, Wells Fargo's attorneys' reference to the postcard is simply being used as a means to deceive putative class members into speaking with them – and they are wrongly using the prestige of a Court-approved process to achieve that goal.

*Second*, Wells Fargo is improperly using the "opt-in" procedure to target only those former customers who expressed an interest in speaking with Plaintiffs' counsel.  In so doing, Wells Fargo's is perverting this Court's well-intended efforts to protect consumer privacy.  As noted above, in a typical Belaire-West procedure, Plaintiffs' counsel will receive all of the class members' contact information unless they expressly opt-out.  (Belaire-West Landscape, Inc. v. Sup. Ct., 149 Cal.App.4th at 556.)  Consequently, the defendant does not learn the identities of which customers want to speak with the plaintiff's counsel.  In contrast, the current "opt-in" procedure identifies only those former Wells Fargo customers who affirmatively consent to being contacted by Plaintiffs' counsel. (Stolper, Ex. A.)  The courts and rules of professional conduct recognize the inherent danger and potential for abuse in permitting a defendant's attorney to speak with a putative class member alone without the representation of an attorney.  (Mevorah, 2005 WL 4813532, at *4-5.)  In these circumstances, the Court is more than justified in precluding Wells Fargo's attorneys from contacting these putative class members without their express prior written consent, just like Plaintiffs' counsel was required to obtain.

*Third,* Wells Fargo is inundating its former customers who consented to speak with Plaintiffs' counsel with telephone calls and voice mails, in an effort to reach them before Plaintiffs' counsel, with the predictable effect of discouraging them from returning Plaintiffs' calls.  Notably, when Wells Fargo was trying to convince this Court that an "opt-in" procedure was necessary in the first place, Wells Fargo argued that "calling putative class members is a great intrusion into an individual's statutorily protected privacy." (Doc. 57, p. 5.) This concern, which the Court shared, appears to have vanished or at least given way to Wells Fargo's desire to make sure class counsel does not

communicate with these putative class members.  To date, there was nothing preventing Wells Fargo's attorneys from calling any one of the 1.7 million former customers who did not receive their GAP refunds from Wells Fargo.  The fact that Wells Fargo is now targeting only those customers that agreed to be contacted by Plaintiffs' counsel demonstrates this is not a good faith effort to either gather evidence or provide refunds.  These former Wells Fargo customers did not consent to be contacted by Wells Fargo's attorneys, and they should not be subjected to a deluge of telephone calls and voicemails simply because they expressed an interest in being contacted by "the lawyers representing the class."

*Fourth*, one of the primary purposes of the Court's "opt-in" process was to allow Plaintiffs to obtain a "statistically relevant number of class contacts."  (Doc. 60, p. 1.) This is why the Court ultimately authorized the notices be sent to 6,000 people with the hope that it would yield close to the 601 redacted loan files previously produced by Wells Fargo.  (Id. (noting the Court's "opt-in" process "will likely involve contacting considerably more than the original 601 borrowers . . . [h]owever, a strict yield of 601 opt-in borrowers will not be required").)  Wells Fargo's practice of bombarding "opt-in" putative class members with phone calls and voice mails is interfering with Plaintiffs' ability to obtain a statistically relevant number of unredacted loan files – which is likely Wells Fargo's intent.  It should not be permitted.

## V.   PLAINTIFFS' REQUESTED RELIEF SHOULD BE GRANTED ON AN EXPEDITED BASIS.

Plaintiffs are requesting the following relief which is tailored after an order instituted against Wells Fargo in a previous class action where Wells Fargo was found to have engaged in deceptive pre-certification communications with putative class members.  (See Mevorah, 2005 WL 4813532, at *5.)

*First*, this Court should issue an order precluding *both* parties, not just Plaintiffs, from contacting unrepresented putative class members without first receiving express written consent to be contacted by that party.  (Mevorah, 2005 WL 4813532, at *5

(precluding any further precertification communications regarding the lawsuit with any potential class member unless pre-approved by the court).)  This Court has already found these former customers have an important privacy interest in not being contacted by attorneys with unsolicited telephone calls unless the customer expressly consented to such contacts.  (Doc. 60; Stolper, ¶ 3.)  There is no reason this rule should not equally apply to Wells Fargo and its counsel and agents.  Since the putative class members are *former* customers, there is no readily apparent business reason Wells Fargo would need to contact these former customers.  Nevertheless, Plaintiffs have no objection to the Court permitting communications undertaken in the regular course of business unrelated to the issues in this lawsuit and having such communications be excepted from the above restriction.  (<u>Mevorah</u>, 2005 WL 4813532, at *5 (issuing a similar exception to the restriction).)

*Second*, Wells Fargo should be required to (a) disclose which putative class members from the "opt-in" process were contacted by Wells Fargo, when they were contacted and the names, title and employer of the persons who made the contacts on Wells Fargo's behalf, (b) produce copies of the scripts, talking points, etc. that were used during the contacts; and (c) produce any declarations, statements, or written communications exchanged with these putative class members whether or not they were ultimately signed.  (See <u>Mevorah</u>, 2005 WL 4813532, at *5 (issuing similar relief).)

*Third*, the Court should order a second "opt-in" process be conducted with a new pool of 6,000 former customers under the same terms and conditions as the previous process, so the process is untainted by Wells Fargo's conduct.  However, unlike the previous process, Wells Fargo should not be notified by the third-party administrator of the identity of the customers who consented to be contacted by Plaintiffs' counsel nor should Wells Fargo be permitted to contact these 6,000 people until after the process is completed.  There is no reason Wells Fargo needs to know which former customers consented to being contacted by Plaintiffs' counsel as Wells Fargo already has their contact information.  As set forth above, Wells Fargo would not otherwise learn the

identities of putative class members that wanted to speak with Plaintiffs' counsel in a typical <u>Belaire-West</u> "opt-out" procedure.  The "opt-in" procedure was adopted by the Court as a means to protect these former customers' privacy interests, not as a discovery tool for Wells Fargo.  Obviously, if these former Wells Fargo customers ultimately consent to Wells Fargo releasing their records, then Wells Fargo will learn such former customers' identities.  But until then, there is no legitimate reason Wells Fargo needs to know the identities of the "opt-ins."

This relief needs to be granted on an expedited basis because Wells Fargo is presently continuing to contact putative class members who consented to be contacted by Plaintiffs' counsel and there is a significant risk these customers will be deceived into speaking with Wells Fargo's attorneys without the presence of a lawyer protecting the putative class member's interest.

## VI.    CONCLUSION

Based on the foregoing, Plaintiffs' request that this Application be granted.


Dated:  May 5, 2020                         FRANK SIMS & STOLPER LLP

                                                    _____*/s/ Andrew Stolper*_____
                                                    JASON M. FRANK, ESQ.
                                                    ANDREW STOLPER, ESQ
                                                    SCOTT H. SIMS, ESQ.

                                                    *Attorneys for Plaintiffs*