JASON M. FRANK (190957)
ANDREW D. STOLPER (205462)
SCOTT H. SIMS (234148)
FRANK SIMS & STOLPER LLP
19800 MacArthur Blvd., Suite 855
Irvine, CA 92612
Telephone:    (949) 201-2400
Facsimile:    (949) 201-2405

FRANKLIN D. AZAR (*pro hac vice*)
FRANKLIN D. AZAR & ASSOCIATES, P.C.
14426 East Evans Avenue
Aurora, CO 80014
Telephone:    (303) 757-3300
Facsimile:    (303) 759-5203

CHARLES E. SHAFFER (*pro hoc vice*)
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone:   (215) 592-1500
Facsimile:   (215) 592-4663

*Attorneys for Plaintiffs, the Proposed Class and Subclasses*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

ARMANDO HERRERA, EDUARDO SALCEDO, DENA LUCERO, FREDERICK BROWN, VANITY ARRINGTON, KASHIF Z. AWAN, GRETTA CARTER, JAMES ATKINS, ILKA ROBINSON-EATON, JANET CORPES, TERRI JONES, HEIDI HUMPHREYS, RIA MARTEINS, BRIAN T. SWEENEY, NAKECIA M. DEAN, and VON GRIFFIN each individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

WELLS FARGO BANK, N.A. D/B/A WELLS FARGO DEALER SERVICES, INC., a national association, and WELLS FARGO & COMPANY, a corporation

Defendants.

Case No.:  8:18-cv-00332-JVS-MRW

**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**

**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**

Plaintiff Armando Herrera, et al. (collectively "Plaintiffs") filed their Motion for Attorneys' Fees, Costs and Incentive Awards (Dkt. 202). Plaintiffs also filed a Motion for Final Approval of Nationwide Class Action Settlement (Dkt. 205) (the "Motions"). Defendant Wells Fargo Bank, N.A. ("Wells Fargo") filed a statement of non-opposition with respect to both Motions (Dkt. 206). The Motions came on regularly for hearing on November 15, 2021 before the Honorable James V. Selna.

For the following reasons, the Court **GRANTS** final approval of the Settlement, **GRANTS** Plaintiffs $23.1 million in attorney's fees, **GRANTS** Plaintiffs $260,982.42 in litigation expenses, and **GRANTS** a total of $46,375 in service payments to be divided among the Plaintiffs as reflected in Section III.E.

# I.  BACKGROUND

## A.  *Allegations and Procedural History*

The general background of this dispute is well-known to the parties and to the Court. Plaintiffs allege that Wells Fargo knowingly collects unearned fees for Guaranteed Automobile Protection ("GAP") Waivers ("GAP Agreements") and refuses to refund them despite being obligated to do so. First Amended Complaint ("FAC"), Dkt. No. 102, ¶ 1. A GAP Agreement is an addendum to a financing agreement to purchase a car, which provides that if a customer suffers a total loss in an accident during the course of the financing agreement, the customer will be paid the difference between the insurance payout based upon the vehicle's value and the remaining balance on the loan in exchange for a GAP fee. See FAC ¶¶ 4-6. The Plaintiffs agreed to purchase GAP Waivers when purchasing their cars at different car dealerships. Id. ¶¶ 8, 28, 29. The dealerships then sold and assigned the Plaintiffs' finance agreements, including the GAP Agreements, to Wells Fargo. Id. ¶¶ 8, 22, 28. Following assignment, Plaintiffs made all payments on their finance agreements to Wells Fargo. FAC ¶ 111.

Plaintiffs allege that upon purchasing the finance agreements, Wells Fargo took over all rights and obligations under the agreement as the assignee. Id. ¶¶ 54, 57. When Plaintiffs paid off their finance agreements early, Wells Fargo informed them how

much they still owed on the finance agreement and included in that amount certain fees for GAP protection through the original maturity date, even though by paying off the contract early the GAP Waiver protection would necessarily also be ending early. Id. ¶¶ 11, 29, 60, 61.  Wells Fargo allegedly actively concealed its obligation to issue a refund on the GAP Waiver fees for the portion of the GAP Waiver's initial coverage that was cut short by early payoff, and denied any obligation to return the unearned GAP fees.  Id. ¶¶ 13-14.  According to the terms of the contract, the GAP Agreement is optional, can be canceled by the customer at any time, and permits customers to request a partial refund of the amount paid for GAP in the event of early cancellation.  Id. ¶¶ 4, 22, 28.

The FAC outlines six claims against Wells Fargo: 1) breach of contract; 2) violation of the Truth in Lending Act, 3) money had and received; 4) violation of the California Unfair Competition Law; 5) violation of the California Consumer Legal Remedies Act; and 6) a claim for declaratory relief. Id. at ¶¶ 52-105.

The FAC also contains six class allegations, including a nationwide class; state subclasses for the states of California, Colorado, Delaware, Illinois, Kentucky, Maryland, New Jersey, Ohio, Pennsylvania, Texas, and Wisconsin; a statutory refund subclass; a California unfair business practices subclass; alternative nationwide subclasses limited to specific GAP Waiver forms; and alternative state subclasses limited to specific GAP Waiver forms.  Id. at ¶¶ 36(a)-(f). Finally, Plaintiffs also allege bellwether subclasses of the nationwide class. Id. at ¶ 36(g).

**B.    *Summary of the Settlement***

      **1.    *The Settlement Class***

The Settlement Class is defined as:

> all persons in the United States (a) who entered into Finance Agreements with GAP Agreements that were assigned to Wells Fargo, (b) whose Finance Agreements were terminated as the result of an Early Payoff which occurred

during the Class Period, and (c) who did not receive a GAP Refund.

Settlement Agreement, Dkt. No. 200, Ex. 1, Definitions , ¶ 8. The Class Period varies depending on the state of origination of a Class Member's Finance Agreement and runs from the date listed in the chart in Exhibit B of the Settlement Agreement until the date of preliminary approval of the Settlement Agreement. Id., Definitions ¶ 11, Ex. B. The dates listed in Exhibit B reflect the statute of limitations for breach of contract claims. Frank Decl., Dkt. No. 200-1, ¶ 24. The Settlement Class also includes the members of the Statutory Subclass. Id. The Statutory Subclass is defined as:

> those persons (a) who entered into Finance Agreements with GAP Agreements that were assigned to Wells Fargo, (b) whose Finance Agreements were subject to State Refund Laws,(c) whose Finance Agreements terminated as the result of an Early Payoff that occurred during the Statutory Subclass Period, and (d) who did not receive a GAP Refund from Wells Fargo, or for whom Wells Fargo did not receive written confirmation from a Dealer or GAP Administrator that the GAP Refund was paid.

Id., Definitions ¶ 55. The Statutory Subclass Period also varies depending on the state of origination of a Class Member's Finance Agreement and runs from the date listed in the chart in Exhibit E of the Settlement Agreement until the date of preliminary approval of the Settlement Agreement. Id. Definitions ¶ 57, Ex. E. The dates listed in Exhibit E reflect when there were effective State Refund Laws, which are defined as state laws that "require indirect auto lenders to take certain actions to ensure that a customer receives a GAP Refund after an Early Payoff." Id., Definitions ¶ 56. Those Class Members who are not members of the Statutory Subclass are called "Non-Statutory Subclass Members." Mot. at 9.

### 2.    Settlement Amount and Injunctive Relief

Under the terms of the Settlement, Wells Fargo will take several actions to compensate the Class Members. First, Wells Fargo will implement processes by January 1, 2022 that will automatically provide Early Payoff GAP Refunds to

4

customers in all 50 states so long as they complete an Early Payoff. Settlement Agreement § III.A. This obligation will continue until January 1, 2026. Id.

Second, Wells Fargo warrants that it will directly pay Early Payoff GAP Refunds together with compensation for the loss of the use of these funds since the date of Early Payoff to Statutory Subclass Members who have not received such payment at this point. Id. § III.D. The compensation for lost use will be "based on the one-year constant U.S. maturity treasury rate from the date of the Early Payoff, compounded annually." Id.

Third, Wells Fargo agrees to set up a Supplemental Settlement Fund containing $45,000,000 that will pay out "(1) Approved Claims for GAP Refunds to Non-Statutory Subclass Members; (2) the $5.00 Additional Compensation payments to the Statutory Subclass; (3) any Fee and Expenses Awards; and (4) anyService Awards." Approval Mot. at 11; Settlement Agreement § III.B.

Non-Statutory Subclass Members qualify for the Approved Claims for GAP Refunds if they submit an executed claim form verifying that they did not receive a GAP Refund from a dealer or GAP Administrator. Settlement Agreement § 111.C.1. Such Non-Statutory Subclass Members will be eligible to receive up to the full amount of their Early Payoff GAP Refund, without any deduction for cancellation fees. Id. Each member of the Statutory Subclass will be eligible for the $5.00 Additional Compensation payments. Id. § 111.C.2.

After the deduction of the Fee and Expenses Awards and the Service Awards, if the Supplemental Settlement Fund is not sufficient to cover in full the $5.00 Additional Compensation payments and the Approved Claims for GAP Refunds, then each payment will be reduced by an equal percentage necessary to allow the Supplemental Settlement Fund to cover all payments. Id.§ III.C.5; Approval Mot. at 11.

**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**

### 3.    *Attorneys' Fees and Costs*

Class Counsel are (i) Jason M. Frank, Andrew D. Stolper, and Scott H. Sims of Frank Sims & Stolper LLP; (ii) Franklin D. Azar of Franklin D. Azar & Associates, P.C.; (iii) Charles E. Schaffer of Levin Sedram & Berman.

Class Counsel request $23.1 million in attorney's fees and $260,982.42 in costs. Fees Mot. at 6.

### 4.    *Administrative Expenses and Service Awards*

Wells Fargo agreed to separately pay for all Notice and Administrative Costs, including sending a notice of the Settlement by first-class mail. Settlement Agreement§ III.E. On June 8, 2021, the Court appointed JND Legal Administration ("JND") as the Claims Administrator. Dkt. No. 201, at 21. The most recent information from the Claims Administrator shows that such costs will exceed $5.5 million. Eoff Decl., Dkt. No. 205-16, ¶ 28.

Wells Fargo also agreed not to oppose an application for Service Awards of up to $7,500 for each class representative. Id. § VI.E.  Plaintiffs request service awards of $7,500 for each of the fifteen class representatives. Fees Mot. at 6.

### 5.    *Release*

On final approval of the Settlement Agreement, "Plaintiffs and every member of the Class and Statutory Subclass who does not timely request exclusion from the Settlement will release Wells Fargo and the Class Releasees from any and all claims 'arising from or relating in any way to the Class Member's entitlement to an Early Payoff GAP Refund for an Early Payoff that occurred during the Class Period (the "Class Released Claims")."' Approval Mot. at 12 (quoting Settlement Agreement§ II.A).

The Class Release applies to Wells Fargo and each of their "former, present, or future agents, insurers, predecessors, successors, subsidiaries, parent company(ies), affiliates, officers, directors, and employees and attorneys." Settlement Agreement §

II.A. The Class Releasees do not include any dealers or GAP Administrators. Approval Mot. at 12.

### 6. Notice

The Parties selected JND Legal Administration ("JND") to be the Settlement Administrator. Settlement Agreement, Definitions, ¶ 3. The Court approved that selection and appointed JND as Administrator. Dkt. No. 201, at 21. On June 17, 2021, JND provided notice of the Settlement to the relevant State Attorneys General, as required by the Class Action Fairness Act. Eoff Decl., Dkt. No. 205-16, ¶¶ 3-4. JND mailed notice to approximately 2,678,266 potential Non- Statutory Subclass Members and 119,680 Statutory Subclass Members. Id. ¶ 5. 90% of mailings to Non-Statutory Subclass Members were deemed delivered, and 81% of mailings to Statutory Subclass Members were deemed delivered.  Id. ¶ 9.  Follow-up email notices were sent to 1,977,514 potential Non-Statutory Subclass Members and 170,333 Statutory Subclass Members, of which 91% and 89% were deemed delivered, respectively.  Id. ¶ 12.  A digital advertising campaign generated an additional 5,195,027 views.  Id. ¶ 13.

### 7. Opt Out and Objection Process

Class Members had the right to opt-out of the Settlement Agreement by submitting a signed, written request to JND postdated by the Response Deadline. Settlement Agreement § VII.D.  Any Class Member who wished to object to the Settlement Agreement was required to submit a written statement to JND by the Response Deadline and to submit the same statement to the Court.  Id. § VII.E.  The Notice provided information about where to send the opt-out requests and objections. Id. at Exs. C & D.

### 8. Revocation of Agreement

The Parties retain the right to terminate the Settlement Agreement if "(l) the Court rejects, modifies, or denies approval of any portion of this Agreement or the proposed Settlement that results in a substantial modification to a material term of the proposed Settlement; or (2) the Court, or any appellate court(s), does not enter or

7

**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**

completely affirm, or alters, narrows or expands, any portion of the Final Approval Order, that results in a substantial modification to a material term of the proposed Settlement." Id. § VII.F.

### C.  *Results of Notice*

On August 6, 2021, JND mailed notice to approximately 2,678,266 potential Non-Statutory Subclass Members and 119,680 Statutory Subclass Members. Id. ¶ 5. 90% of mailings to Non-Statutory Subclass Members were deemed delivered, and 81% of mailings to Statutory Subclass Members were deemed delivered. Id. ¶ 9. Follow-up email notices were sent to 1,977,514 potential Non-Statutory Subclass Members and 170,333 Statutory Subclass Members, of which 91% and 89% were deemed delivered, respectively. Id. ¶ 12. A digital advertising campaign generated an additional 5,195,027 views. Id. ¶ 13.

The deadline for submitting Claim Forms, Requests for Exclusion and Objections was on October 6, 2021. Approval Mot. at 13. As of November 11, 2021, a total of 476,555 timely claims were submitted, 638 timely requests for exclusion were submitted and 13 objections were submitted. Eoff Decl., Dkt. No.201 ¶¶ 3-5. JND continues to process mailed claims and notes that they will provide updated figures, as necessary. Id.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure Rule 23(e) requires court approval for class-action settlements. Fed. R. Civ. P. 23(e).  When the parties reach a settlement agreement before class certification, a court uses a two-step process toapprove a class-action settlement. Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003). First, the court must certify the proposed settlement class. Id. Second,the court must determine whether the proposed settlement is fundamentally fair, adequate, and reasonable. Id.

**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**

### III.    DISCUSSION

#### A.    *Class Certification*

The Court preliminarily certified the proposed Class in its prior order.  Dkt. No. 201, at 21.  No party has given the Court reason to revisit that earlier decision. Therefore, for the reasons specified in its preliminary approval order, the Court certifies the Settlement Class for final approval of the Settlement.

#### B.    *Approval of the Proposed Class Settlement*

##### *1.    The Fairness Factors Support Settlement Approval*

Under Rule 23(e)(2) if the proposed settlement would bind class members, the Court may approve it only after a hearing and only on finding that it is fair, reasonable and adequate.  To make this determination, the Court must consider the following factors:

(A)    the class representatives and class counsel have adequately represented the class;

(B)    the proposal was negotiated at arm's length;

(C)    the relief provided for the class is adequate, taking into account:

(i)    the costs, risks, and delay of trial and appeal;

(ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)    the terms of any proposed award of attorneys' fees, including timing of payment; and

(iv)    any agreement required to be identified under Rule 23(e)(3); and

(D)    the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Before the revisions to the Federal Rule of Civil Procedure 23(e), the Ninth Circuit had developed its own list of factors to be considered.  See *e.g.*, In re Bluetooth Headset Products Liability Litigation, 654 F.3d 935, 964 (9th Cir.2011) (citing Churchill Village, L.L.C. v. General Electric, 361 F.3d 566, 575 (9th Cir. 2004)).  The

9

revised Rule 23 "directs the parties to present [their] settlement to the court in terms of [this new] shorter list of core concerns[.]" Fed. R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes.  "The goal of [amended Rule 23(e)] is . . . to focus the [district] court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Id.

### a)  *Adequacy of Representation by Class Representatives and Class Counsel*

Under Rule 23(e)(2)(A), the first factor to be considered is whether the class representatives and class counsel have adequately represented the class.  This analysis includes "the nature and amount of discovery" undertaken in the litigation.  Fed. R. Civ. P. 23(e)(2)(A), 2018 Advisory Committee Notes.

The Court finds that the class representatives and class counsel adequately represented the class in this case.  Over the three years since the complaint was initially filed, class counsel analyzed more than a million pages of documents produced by Wells Fargo; subpoenaed and reviewed thousands of pages of documents from third-party dealers, GAP Administrators, and Wells Fargo's government submissions; took eight depositions, including of Wells Fargo managers; responded and served hundreds of interrogatories and requests for admission; and engaged in extensive motions practice.  Frank Decl., Dkt. No. 202-1, ¶¶ 12, 14.  Class Counsel also defended a full-day deposition of James Atkins, one of the Class Representatives. Id.  Thus, this factor weighs in favor of approval.

### b)  *Negotiated at Arm's Length*

The second Rule 23(e)(2) factor asks the Court to confirm that the proposed settlement was negotiated at arm's length.  Fed. R. Civ. P. 23(e)(2)(B).  As with the preceding factor, this can be "described as [a] 'procedural' concern[], looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement."  Fed. R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes.  "[T]he involvement of a neutral or court-affiliated mediator or facilitator in [settlement]

negotiations may bear on whether th[ose] [negotiations] were conducted in a manner that would protect and further the class interests." Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes; accord <u>Pederson v. Airport Terminal Services</u>, 2018 WL 2138457, at *7 (C.D. Cal. April 5, 2018) (the oversight "of an experienced mediator" reflected non-collusive negotiations).

The Court finds that the Settlement was negotiated at arm's length. The parties engaged in an initial mediation session before Judge Louis Meisinger (Ret.), and then three additional mediation sessions before Judge Andrew J. Guilford (Ret.). Frank Decl., Dkt. No. 202-1, ¶¶ 16-20; Guilford Decl., Dkt. No. 202-6, ¶¶ 4-6. The parties reached an agreement on the material terms for the Class before attending a separate mediation session before Judge Guilford for the purpose of presenting evidence and arguments concerning an appropriate award of attorney's fees, costs, and service awards. <u>Id.</u> Judge Guilford reached an independent determination of a reasonable award of attorneys' fees, <u>see</u>, Guilford Decl., Dkt. No. 202-6, which the parties submitted for this Court's consideration. In sum, the conduct throughout the negotiations was appropriate to protect the Class's interests.

The Court is therefore confident in the arm's length process the Parties undertook, and that the Settlement is not the production of collusion.

### c)   *Adequacy of Relief Provided for the Class*

The third factor the Court considers is whether "the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C). Under this factor, the relief "to class members is a central concern." Fed. R. Civ. P. 23(e)(2)(C), Advisory Committee Notes.

**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**

As discussed above, there are several different components of the class relief. First, Wells Fargo has already paid out at least $33.5 million to 105,297 Statutory Subclass Members, an average of approximately $318 per person.  Frank Decl., Dkt. No. 205-2, ¶ 12.  Second, Non-Statutory Subclass Members will receive approximately $21 million in past refund payments, an estimated average payout of $44 per person who submitted a valid claim form.  Id. ¶¶ 16-17.  Additionally, Wells Fargo separately agreed to pay the notice and administrative costs, currently estimated at over $5.5 million. Eoff Decl., Dkt. No. 205-16, ¶ 28.  While notice and administrative costs do not go directly to the class, they may be properly considered a benefit because they make it possible to distribute the settlement award in a "meaningful and significant way" and allow class members to learn about the settlement.   In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 953(9th Cir. 2015).

Finally, the Settlement requires Wells Fargo to automatically pay Early Payoff GAP Refunds to all customers for at least the four year period beginning onJanuary 1, 2022 (the "Business Practice Change").  Settlement Agreement § III.D.  Plaintiffs present data showing that if Wells Fargo had implemented the Business Practice Change during the period from 2013 through 2017, the annual average value of Early Payoff GAP Refunds would be more than $104 million per year.  Baggett Decl., Dkt. No. 202-4, ¶¶ 16-27.  Given the consistency of the annual refunds, Plaintiffs assert that the value of future refunds due to the Business Practice Change can be calculated by extrapolating the annual average over the four year period, resulting in a total estimated value of $417,029,964 in future Early Payoff Gap Refunds.  Id. ¶ 27. Further, based on the frequency of repeat customers in the data, Plaintiffs estimate that approximately 5.63% of the refunds will be paid to existing class members on future agreements.  Id. ¶¶ 28-36.  Based on these calculations, Plaintiffs assert that this will create an additional $23,467,074 in benefits for class members.  Id. ¶ 36.

**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**

In response to notice of the Settlement, Class Counsel received a total of thirteen objections.  As many of them concern the adequacy and structure of relief, the Court reviews them in turn.

First, some of the objectors express concerns about the value of the settlement they received.  Mona Budhiraja objects to the Settlement because she believes she should be refunded the full amount she paid for GAP coverage.  <u>See</u> Approval Mot. at 27; Dkt. No. 205-3.  Raymond Poole objects to the amount of his potential refund and requests a larger award.  <u>See</u> Approval Mot. at 28; Dkt. No. 205-7.  Bobbie New questions whether their GAP refund check was for the appropriate amount.  <u>See</u> Approval Mot. at 28; Dkt. No. 205-6.  The Claims Administrator confirmed that the notice amount for Bobbie New was correct.  Regarding the other concerns about individual payment size, the Court agrees with the Plaintiffs that the settlement payments are reasonable in light of the uncertaintyof any payout if the case went to trial and the importance of compromise in reaching a settlement.

Next, multiple objectors express concern about the value of the settlement specifically as it relates to interest.  J.C. Dimsdale objects to the Settlement because he believes that Non-Statutory Subclass Members should receive lost interest on their GAP refunds.  <u>See</u> Approval Mot. at 28; Dkt. No. 205-9.  Jose Garcia Sr. objects to his potential refund of $59.41 because he believes that Wells Fargo made a larger profit by keeping his money over the past three years.  <u>See</u> Approval Mot. at 29; Dkt. No. 205-10.  Again, the Court agrees with the Plaintiffs that the settlements handling of interest is reasonable in light of the uncertainty of any payout if the case went to trial and the importance of compromise in reaching a settlement.

One objector also raises concerns about the attorneys' fees.  James Becwar objects to the Class Counsel request for $23.1 million in fees.  Approval Mot. at 30; Dkt. No. 205-11.  Becwar argues that this constitutes 51% of the settlement fund of $45 million, and that the "normal rate" should be closer to 15%. Dkt. No. 205-11.  Plaintiffs note that the $45 million referenced by Becwar as the total settlement value

only includes the Supplemental Settlement Fund, and that the true value of the settlement is significantly higher when the value of the Business Practice Change, payments to the Statutory Subclass, and notice and administration costs are included. Approval Mot. at 30.  The Court agrees that the true value of the settlement is significantly higher than $45 million.  The separate question of the appropriate percentage of attorneys' fees is discussed in more detail below.  See infra Section III.D.  The Court finds that the requested attorneys' fees are reasonable in light of Ninth Court precedent and the work performed by Class Counsel in this case.

Additionally, several objectors raise concerns about Wells Fargo business practices more generally.  Linda Abshire mentions her "many problems" with Wells Fargo and alleges that it improperly opened accounts in her name and hurt her credit rating.  See Approval Mot. at 27; Dkt. No. 205-4.  Wendy Jenkins objects to the timeline of the settlement, expresses her belief that Wells Fargo owes her other settlements, and believes that it should "[j]ust pay the gap money owed" to her.  See Approval Mot. at 27; Dkt. No. 205-5.  Kimberly Dutton raises concerns about Wells Fargo business practices and objects to the Settlement because she believes that Wells Fargo should be required to pay the full balance of $22,396.90 owed by Dutton to Wells Fargo under a finance agreement on a different vehicle.  See Approval Mot. at 28; Dkt. No. 205-8.  In response, Plaintiffs emphasize that these concerns fall outside the scope of the settlement.  See Approval Mot. at 27-28.  The Court agrees with Class Counsel.  If the objectors have concerns with Wells Fargo business practices beyond GAP refunds, the appropriate place to raise those concerns would be in a separate action, not in this case.

Finally, multiple objectors appear to suggest that they do not believe that the Class should receive any Settlement.  Marilyn Kaufmann objects to the Settlement because as a policy matter she does not believe that customers should be entitled to receive a GAP refund.  See Approval Mot. at 29; Dkt. No. 205-11.  James Taylor objects generally to the "GAP payments" and to "overpayment to the settlement."  See

14

Approval Mot. at 29; Dkt. No. 205-12.  Stacy Watts objects to the entire settlement because she believes that the entire case should be dismissed, customers should have contacted the Dealer or GAP Administrator for their refunds, and that Class Counsel are receiving excessive benefits.  <u>See</u> Approval Mot. at 29; Dkt. No. 205-13.  Sherrelle Patterson appears to object because she received her GAP refund directly from the Dealer.  <u>See</u> Approval Mot. at 30; Dkt. No. 205-14.  Plaintiffs disagree with their positions, noting that they filed this lawsuit specifically to require Wells Fargo to pay GAP refunds.  <u>See</u> Approval Mot. at 29-30.  The years of litigation, settlement negotiations, and changes to state law show that others agree with their position as well.  The Court finds that these generalized objections based on personal preferences do not call into question the adequacy of the settlement for the class.

As such, the Court is not persuaded that Objectors' arguments are sufficient to justify rejecting the Settlement.  The Court therefore concludes that the relief provided for Class Members is, at a general level, adequate.  The Court now turns to a more particular consideration of the factors outlined in Rule 23(e)(2)(C).

### (1)   *Costs, Risks, and Delay of Trial and Appeal*

"A[] central concern [when evaluating a proposed class action settlement] . . . relate[s] to the cost and risk involved in pursuing a litigated outcome."  Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes.  In evaluating this factor, the Court "must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case[.]"  <u>Kullar v. Foot Locker Retail, Inc.</u>, 168 Cal. App. 4th 116, 130 (2008).  "In the context of a settlement . . . the test is not the maximum amount plaintiffs might have obtained at trial on the complaint, but rather whether the settlement is reasonable under all of the circumstances."  <u>Wershba v. Apple Computer, Inc.</u>, 91 Cal. App. 4th 224, 250 (2001).

This case is still in the pleadings stage, and so Class Counsel assert that litigation would drag on through class certification, summary judgment, trial, and appeal if Plaintiffs are successful in the absence of the Settlement Agreement, a

process that they allege could take years.  See Approval Mot. at 22; Frank Decl., Dkt. No. 202-1, ¶ 37(d).  Class Counsel list a number of other risks that would come with trial and appeal, including overcoming Wells Fargo's various contract defenses to the claims brought by the Non-Statutory Subclass, arbitration clauses binding many Class Members, and the fact that in the three years that Class Counsel have litigated so far, they have already incurred more than $11 million in fees and costs.  Frank Decl., Dkt. No. 202-1, ¶ 37(e).  This subfactor therefore favors preliminary approval of the Class Settlement because in its absence there will be inevitable costs, high risks, and delay.

### (2)     *Effectiveness of Proposed Method of Relief Distribution*

Next, the Court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."  Fed. R. Civ. P. 23(e)(2)(C).  "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims."  Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes.  "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding."  Id.

The parties designed a straightforward claims process.  Wells Fargo verified the validity of claims from Statutory Subclass Members using internal records, thus no form submission was necessary.  Frank Decl., Dkt. No. 205-2, ¶ 11.  Those settlement payments were directly mailed by Wells Fargo, and the Additional Compensation payments will be mailed by the Claims Administrator.  Id. ¶ 12.  Non-Statutory Subclass Members were required to submit a Claim Form verifying under oath that they did not receive a GAP refund from a dealer or GAP Administrator.  Id. ¶¶ 7-9.  They had the option of mailing the Claim Form to the Claims Administrator, completing it electronically on the Settlement Website, or scanning a QR Code on a smartphone or tablet.  Id.  Requiring completion of a claims form is not onerous, and the parties provided a number of different options to do so.  See In re Toyota Motor Corp.

_Unintended Acceleration Marketing, SalesPractices, & Products Liability Litigation_, 2013 WL 3224585, at *18 (C.D. Cal. June 17, 2013) ("The requirement that class members download a claim form or request in writing a claim form, complete the form, and mail it back to the settlement administrator is not onerous."). The Court concludes that the method ofrelief distribution was effective.

### (3)    *Terms of Proposed Award of Attorneys' Fees*

Third, the Court must consider "the terms of any proposed award of attorneys' fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(c).

Class Counsel seeks $23.1 million in attorneys' fees and $260,982,42 in expenses. Fees Mot. at 1. The Court concludes that the value of the Settlement is at least $84 million, and has a likely future value to class members of approximately $107 million. See _infra_ Section III.D.ii. After considering Class Counsel's motion for attorney's fees, the Court concludes that the amount in attorney's fees is reasonable relative to the benefits of the Settlement for Settlement Class Members. See _infra_ Section III.D. This factor weighs in favor ofapproval.

### (4)    *Agreement Identification Requirement*

The Court must also evaluate any agreement made in connection with the proposed Settlement. See Fed. R. Civ. P. 23(e)(2)(C)(iv), (e)(3).

Here, the Settlement Agreement before this Court is the only agreement. Mot. at 26. Thus, the Court need not evaluate any additional agreements outside of the evaluation it makes of the Settlement Agreement.

The Court is satisfied that the form of relief is adequate.

### d)    *Equitable Treatment of Class Members*

The final Rule 23(e)(2) factor turns on whether the proposed settlement"treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the

apportionment of relief."   Fed. R. Civ. P. 23(e)(2)(D), 2018 Advisory Committee Notes.

The Settlement draws a distinction between Statutory Subclass Members and Non-Statutory Subclass Members.  Statutory Subclass Members automatically receive the full value of their Early Payoff GAP Refunds, averaging an individual payment of $318 per person.  Frank Decl., Dkt. No. 205-2, ¶ 12.  Meanwhile, the Non-Statutory Subclass Members will split a pool of approximately $21 million, with a projected average payout of $44 per person.  Id. ¶¶ 16-17.  The Court agrees with Plaintiffs that this distinction is logical because Statutory Subclass Members are able to rely on the State Refund Laws that require that an indirect auto lender like Wells Fargo ensure that a GAP Refund is paid after an Early Payoff.[1]  Frank Decl., Dkt. No. 205-2, ¶ 18.

As discussed below, the Court finds the $7,500 requested on behalf of each of the fifteen class representatives to be excessive in light of the amount of work they each performed on behalf of the Settlement Class.  See infra Section III.E.  On the other hand, the Court does not consider the requested service fees to be suggestive of the overall Settlement being unreasonable considering the comparatively large value of the Settlement.  The Court therefore concludes that while this factor weighs against final approval, it is not sufficient to be determinative.

Given the preceding analysis, the Court concludes that the Settlement meets the requirements of Rule 23(e)(2).

---

[1] Per the Court's request, the parties provided a complete list of the State Refund laws.  See Dkt. No. 202-1 at 142. The Court reproduces that list here for ease of reference, with a clerical correction of the citation to the Nebraska revised statutes: Alabama (Ala. Code § 8-37-6; Ala. Admin. Code § 155- 2-2-.13); Colorado (4 Colo. Code Regs. § 902-l-8(h)); Indiana (Ind. Code § 24-4.5-3-202); Iowa (Ia. St. § 537.2510(1); Ia. St. § 537.1301(18)); Maryland  (Md. Coml. §12-1009(d); Md. Coml. §§ 12-1007(b)(l); Md. Coml. § 12-613); Massachusetts (Ma. St. 140D §22, Mass Gen. Laws Ch. 255B § 16); Nebraska (Neb. Rev. Stat. §§ 45-1101-08); New Jersey (N.J. Stat. § 17:16B8-6); Nevada (Nev. Rev. Stat. § 690D.200); Oklahoma (Ok. Admin. Code § 160:45-5-5); Oregon (O.R.S. § 646A.781); Texas (Tex. Admin. Cod § 83.812; Tex. Fin Code § 354.007); Vermont (8 V.S.A. § 10405(b)(l)(A); 8 V.S.A. § 10405(c)(l1)); Wisconsin (WSA § 218.0148(4)(g)).

18

### C. The Proposed Settlement Class Meets the Notice Requirements Under Fed. R. Civ. P. 23(c)(2)(B)

Under Rule 23(c)(2)(B), "for any class certified under Rule 23(b)(3)-or upon ordering notice under Rule 23(e)(l) to a class proposed to be certified for purposes of settlement  under Rule 23(b)(3) the court must direct  to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  Rule 23(c)(2)(B) further states that the notice may be made by one of the following: United States mail, electronic means, or another type of appropriate means. Id. "The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v)that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting  exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Id.

The Court previously approved the plan for sending notice to potentialClass Members.  See Preliminary Approval Order.   On June 17, 2021, JND provided notice of the Settlement  to the relevant State Attorneys General, as required by  the Class Action Fairness Act.   Eoff Decl., Dkt. No. 205-16, ¶¶ 3-4.   JND mailed notice to approximately 2,678,266 potential Non-Statutory Subclass Members  and  119,680 Statutory Subclass Members.   Id. ¶ 5.  90% of mailings to Non-Statutory Subclass Members were deemed delivered, and 81% of mailings toStatutory Subclass Members were deemed  delivered.  Id. ¶ 9.  Follow-up  email notices were sent to 1,977,514 potential Non-Statutory Subclass Members and 170,333 Statutory Subclass Members, of which 91% and 89% were deemed delivered, respectively.  Id. ¶ 12.  A digital advertising campaign generated an additional 5,195,027 views. Id. ¶ 13.

"Notice is satisfactory if it generally describes the terms of the settlement in sufficient  detail to alert those with adverse viewpoints  to investigate  and to come

forward and be heard." Rodriguez v. West Publishing Corp., 563 F.3d 948, 962 (9th Cir. 2009) (internal quotation marks and citation omitted). "Settlement notices are supposed to present information about a proposed settlement neutrally, simply, and understandably[.]" Id. "That standard does not require detailed analysis of the statutes or causes of action forming the basis for the plaintiff class's claims, and it does not require an estimate of the potential value of those claims." Lane v. Facebook, Inc., 696 F.3d 811, 826 (9th Cir. 2012). The notice previously approved by the Court and implemented by JND satisfies this standard. Accordingly, theCourt finds that the notice to the Settlement Class was fair, adequate, and reasonable.

Given the foregoing analysis, the Court **GRANTS** Plaintiffs' motion seeking final approval of the Settlement.

### D.    *Attorney's Fees*

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the determination whether the settlement is 'fundamentally fair, adequate, and reasonable.'" Staton, 327 F.3d at 963 (quoting Fed. R. Civ. P. 23(e)). "The reasonableness of any fee award must be considered against the backdrop of the 'American Rule,' which provides that courts generally are without discretion to award attorneys' fees to a prevailing plaintiff unless (1) fee-shifting is expressly authorized by the governing statute; (2) the opponents acted in bad faith or willfully violated a court order; or (3) 'the successful litigants have created a common fund for recovery or extended a substantial benefit to a class.'" In re Bluetooth, 654 F.3d at 941 (quoting Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240,275 (1975) (Brennan, J., dissenting)).

"In class action cases where the defendants provide monetary compensation to the plaintiffs, 'courts have discretion to employ either the lodestar method or the

percentage-of-recovery method.'"  In re Hyundai and Kia Fuel Economy Litigation, 926 F.3d 539, 570 (9th Cir. 2019) (en banc) (quoting In re Bluetooth, 654 F.3d at 942). Thus, the court evaluates the fee request under both methods.

### 1.    *Percentage Method*

"[W]here the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees." Staton, 327 F.3d at 974.  The Ninth Circuit "has established 25% of the common fund as a benchmark award for attorney fees." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1029 (9th Cir. 1998). The Court has discretion in determining what constitutes the total value of the settlement in the denominator.  See In re Online DVD, 779 F.3d at 953.  The benchmark is also not rigid - it leaves room for the consideration the circumstances of the case.  Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047-50 (9th Cir. 2002).  Relevant factors include the results achieved, the risk of the litigation, the skill required, and the contingent nature of the fee. Id.

Plaintiffs argue that the total value of the settlement in the denominator of the percentage calculation should account for four different components.  Fees Mot. at 21.  First, pursuant to the terms of the settlement the Statutory Subclass will receive $33,357,920 in settlement payments.  Frank Decl., Dkt. No. 202-1, ¶ 25(b).  Next, another $45 million will be paid into the Supplemental Settlement Fund to cover claims of the Non-Statutory Subclass, $5.00 additional payments to the Statutory Subclass, and attorneys' fees, costs, and incentive awards approved by the Court.  Id. ¶ 25(c)-(e).  Additionally, Wells Fargo will separately pay the notice and administrative costs, which the most recent estimate from the Claims Administrator puts at $5.5 million.  Eoff Decl., Dkt. No. 205-16, ¶ 28.  The Court finds that it is appropriate to include the full amount of all three of these components in the settlement value.  See In re Online DVD, 779 F.3d at 953 (holding that inclusion of notice and administrative

costs in the full value of settlement was appropriate because they made it possible to distribute the award ina meaningful and significant way).

Plaintiffs also argue that the value of the settlement agreement should include future Early Payoff GAP Refunds that will be provided by Wells Fargo over the next four years due to the Business Practice Change.  As discussed above, Plaintiffs submit calculations showing that the Business Practice Change will provide future Wells Fargo customers with an estimated $417,029,964 in refunds that they would not otherwise receive.  Baggett Decl., Dkt. No. 202-4, ¶ 27.  Of that total, Plaintiffs submit data estimating that current class members will receive $23,467,310 in future refunds as a result of the Business Practice Change.  Id. ¶ 36.  While the future refunds are relevant to the settlement valuation, the guiding principle for the Court is the benefit provided to the class members.

Accepting the calculations submitted by Plaintiffs as accurate, there are three potential valuations of the settlement. First, including the full value of future refunds due to the Business Practice Change results in a total settlement value of $501,029,964. Frank Decl., Dkt. No. 205-2,113.  However, the bulk of those benefits are not going to class members and are thus not appropriate to be considered as part of the settlement value.  See Staton, 327 F.3d at 974 ("[W]here the *value to individual class members* of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees.") (emphasis added). Alternatively, including the portion of future refunds due to the Business Practice Change that will be received by current class members results in a total settlement value of $107,467,310.  Frank Decl., Dkt. No.205-2,113.  Finally, if the Business Practice Change is excluded entirely, the total settlement value would be $84 million. Id. If the future value of the Business Practice Change to class members is included, $23.I million in attorneys' fees would make up 21.5% of the total settlement value.

22

**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**

Id. If the value of the BusinessPractice Change is excluded entirely, the $23.1 million in fees would make up 27.5% of the total settlement value. Id.

The Court finds that it is appropriate to include the future value of the Business Practice Change to class members, and thus the 21.5% fee request wouldbe reasonable under the percentage method. Even if the Court were to exclude the value of the Business Practice Change entirely, the 27% fee request would be a reasonable departure from the benchmark in light of the factors that may be considered as part of the Court's discretion. As discussed above, recovery was uncertain, and the case entailed significant work by class counsel. Additionally, the value of the Business Practice Change is excluded from the total settlement valuation, the real benefits the Settlement will generate for future consumers outside of the Settlement fund still bear consideration.

Thus, the Court finds that the request for $23.I million in attorneys' fees is reasonable under the percentage method.

### 2. *Lodestar Method*

As a cross-check, courts routinely compare the "percentage of the fund" calculation with the lodestar method to ensure that class counsel is not overcompensated. Vizcaino, 290 F.3d at 1050. "The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." In re Bluetooth, 654 F.3dat 941 (citing Staton, 327 F.3d at 965). "Because of a 'strong presumption that thelodestar is sufficient,' a multiplier is warranted only in 'rare and exceptional circumstances.'" Chambers v. Whirlpool Corp., 980 F.3d 645, 665 (9th Cir. 2020)(quoting Purdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 546-52 (2010)). Before applying a multiplier, "the district court must 'decide whether to enhance or reduce the lodestar figure based on an evaluation' of the factors listed in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67 (9th Cir. 1975), 'that are not already subsumed in the initial lodestar calculation.'

Parsons v. Ryan, 949 F.3d 443, 467 (9th Cir. 2020) (quoting Fischer v. SJB-P.D., Inc., 214 F.3d 1115, 1119 & n.4 (9thCir. 2000)).  The factors listed in Kerr include:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

526 F.3d at 70 (citing Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974)). "Moreover, a multiplier must be 'supported by both specific evidence on the record and detailed findings by the lower courts that the lodestar amount is unreasonably low or unreasonably high.'" Id. (quoting Van Gerwen v. Guarantee Mutual Life Insurance Co., 214 F.3d 1041, 1045 (9th Cir. 2000)).

Class Counsel submit declarations stating that they spent over 17,711.6 hours on this case for a total lodestar of approximately $10,856,680.  Fees Mot. at 25; Frank Decl., Dkt. No. 202-1, ¶¶ 42, 45.  Rates range from $900 to $1000 for partners, $550-$875 for mid-level attorneys, staff attorneys, and senior level attorneys, $350-$550 for junior attorneys and associates, and $150-$450 for paralegals.  Frank Decl., Dkt. No. 202-1, ¶ 40; Azar Decl., Dkt. No. 202-2, at 22 (Exhibit 2); Schaffer Decl., Dkt. No. 202-3, at 52 (Exhibit B).  Additionally, the lodestar calculation includes 15 hours billed for an IT professional at an hourly rate of $475.  Schaffer Decl., Dkt. No. 202-3, at 52 (Exhibit B).  This results in a blended rate of approximately $613 per hour. Frank Decl., Dkt. No. 202-1, ¶ 42.  This compares favorably to what other courts within the Ninth Circuit have foundto be reasonable rates in complex, high-stakes litigation. See Perez v. Rash Curtis & Associates, 2020 WL 1904533 (N.D. Cal. Apr. 17, 2020) (reviewing cases and finding blended rate of $634.48 to be reasonable).

24

ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS

The requested $23.1 million fee award represents a 2.13 multiplier over the lodestar. Fees Mot. at 26; Frank Decl., Dkt. No. 202-1, ¶ 45. Plaintiffs argue that several factors support a significant multiplier of the lodestar. First, as previously noted, the case was extensively litigated. Id. at 25-26. Second, substantial benefits were obtained for the class, and injunctive relief will benefit additional Wells Fargo customers who are not part of the class. Id. at 26. Third, the case presented novel claims and complex legal issues. Id. at 26. Fourth, there was significant risk of non-payment because the case was handled on a contingency basis and the outcome was uncertain. Id. at 26.

While a multiplier is not applied in every case, the requested multiplier of 2.13 is within the range of typical lodestar multipliers in this circuit. See Vizcaino, 290 F.3d at 1051 n.6 (finding that multipliers in common fund cases ranging from 0.6 to 19.6, with 83% falling between 1.0 and 4.0, and 54% in the 1.5-3.0 range"). See also In re Prudential Ins. Co. Am. Sales Practice Litig., 148 F.3d 283, 341 (9thCir. 1998) ("[W]e are cognizant that [m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied(.]" (internal quotation marks omitted)). Courts find multipliers to be appropriate particularly in cases like this where the contingent nature of the fee creates a significant risk of non-recovery. "It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for ... contingency cases." In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1299 (9th Cir. 1994). The Court finds that the lodestar analysis does not call into question the reasonableness of the attorneys' fees calculated using the percentage method.

Thus, the Court **GRANTS** Class Counsel $23.1 million in attorneys' fees.

### E.    Service Payments

Class Counsel also seek a $7,500 service payment for the named plaintiffs. Courts have discretion to issue incentive awards to class representatives. Rodriguez,

**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**

563 F.3d at 958-59.  The awards are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  Id.  Courts evaluate incentive awards relative to named plaintiff[s'] efforts, considering "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, ...  the amount of time and effort the plaintiff expended in pursuing the litigation ... and reasonabl[e] fear[s of] workplace retaliation."  Staton, 327 F.3d at 977 (alterations in original) (quoting Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998)).  Courts also compare the incentive awards to the total settlement by looking at "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment."  In re Online DVD, 779 F.3d 934, 947 (9th Cir. 2015) (quoting Staton, 327 F.3d at 977).

In support of their request, Plaintiffs present documentation of the time and effort spent by the named class representatives, including sitting for a deposition, obtaining documents, and investigating their own claims.  See Compendium of Plaintiffs' Decl., Dkt. No. 202-7.  Plaintiffs were also prepared to litigate individual cases depending on rulings about the uniform nature of the forms.  Frank Decl., Dkt. No. 202-1,, 48.  Additionally, they faced financial risks should Wells Fargo seek to recover the cost of the defense, Azar Decl., Dkt. No. 202-2, 16, and one class representative declined a settlement offer with the goal of generating a classwide change in practice.  Sweeney Decl., Dkt No. 202-7, at 65- 66.

Awarding each of the fifteen plaintiffs an incentive award of $7,500 would total $112,500. Frank Decl., Dkt. No. 202-1, ¶ 50.  This is more than 23 times the average recovery of the Statutory Subclass Members.  In comparison to the total settlement amount paid to class members, this represents 0.13 percent of the present value payout to class members and 0.11 percent of total value of class recovery including future payments.  This is within the range of what other courts have found reasonable.  See

**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**

In re Online DVD, 779 F.3d at 947-948 (approving incentive payment of $5,000 where it totaled 0.17% of the settlement fund); Staton, 327 F.3d at 976-77 (rejecting incentive awards of $30,000 totaling 6% of the settlement fund).

However, the Court finds that the requested service award would provide excessive compensation in light of the effort expended. Plaintiffs submitted time declarations on behalf of all of the class representatives. With the exception of Atkins, who spent 94 hours in total, the remainder all spent between 12 hours and 41 hours in connection with this litigation. For those representatives, a service award of $7,500 would constitute an hourly rate of compensation between $182 and $625. This Court has previously found service payments in this range to be unreasonably large. See Alvarez v. Sirius XM Radio, Inc., 2021 WL 1234878, at *12-*13 (C.D. Cal. Feb. 8, 2021) (finding $5,000 payments representing hourly rates between $250 to $417 to be excessive); Palmer v. Pier 1 Imports, 2018 WL 8367495, at *6 (C.D. Cal. July 23, 2018) (reducing $7,500 service payment that would have provided for an hourly rate of $375). Given the time spent by the Plaintiffs, the size of the recovery secured for the Settlement Class, and the risks undertaken, the Court reduces each Plaintiffs' service payment so that it reflects an hourly rate of $125. In light of the time spent on the case by Atkins, the Court maintains his requested service payment of $7,500. The Court **GRANTS** service awards to the Plaintiffs in the following amounts:

| Plaintiff | Estimated Hours | Payment |
|---|---|---|
| Atkins | 94 hours | $7,500 |
| Arrington | 18 hours | $2,250 |
| Awan | 25 hours | $3,150 |
| Brown | 21 hours | $2,625 |
| Carter | 41 hours | $5,125 |
| Corpes | 36 hours | $4,500 |
| Dean | 14 hours | $1,750 |

| | | |
|---|---|---|
| Griffin | 12 hours | $1,500 |
| Herrera | 18 hours | $2,250 |
| Humphreys | 25 hours | $3,125 |
| Jones | 26 hours | $3,250 |
| Lucero | 17 hours | $2,125 |
| Marteins | 13 hours | $1,625 |
| Robinson-Eaton | 15 hours | $1,875 |
| Sweeney | 30 hours | $3,750 |

### F.    Litigation Expenses

Class Counsel further seek reimbursement of $260,982.42 in litigation expenses.  Fees Mot. at 27.  "Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters."  In re Omnivision Techs., 559 F. Supp. 2d at 1048.  The Court has considered the details of the litigation expenses that have been submitted and finds them to be reasonable.  See Frank Decl., Dkt. No. 202-1, at 307 (Exhibit 4); Azar Decl., Dkt. No. 202-2, at 23 (Exhibit 3); Schaffer Decl., Dkt. No. 202-3, at 120 (Exhibit C).  The Court therefore **GRANTS** the motion with respect to litigation expenses.

### IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** final approval of the Settlement, **GRANTS** Plaintiffs $23.1 million in attorney's fees, **GRANTS** Plaintiffs $260,982.42 in litigation expenses, and **GRANTS** a total of $46,375 in service payments to be divided among the Plaintiffs as reflected in Section III.E.

**IT IS SO ORDERED.**

DATED: November 16, 2021

_____
Honorable James V. Selna
United States District Court Judge